**Ronald Jay DuPUIS II, Plaintiff,**

v.

**CITY OF HAMTRAMCK, James Doyle, Donald Crawford, Prema Graham, Dennis Publishing, Inc. and Dennis Digital, Inc., Defendants.**

**Civil Action No. 06–CV–14927.**

United States District Court,
E.D. Michigan,
Southern Division.

July 27, 2007.

Gary T. Miotke, Allen Park, MI, for Plaintiff.

Herschel P. Fink, Honigman, Miller, Schwartz & Cohn, LLP, for Dennis Defendants.

James P. Allen, Charles S. Rudy, Robert H. Feikens, Allen Brothers, PLLC, Detroit, MI, for Hamtramck, Doyle, Crawford and Graham.

## OPINION AND ORDER GRANTING MOTION OF DEFENDANTS DENNIS PUBLISHING, INC. AND DENNIS DIGITAL, INC. FOR SUMMARY JUDGMENT

BERNARD A. FRIEDMAN, Chief Judge.

This matter is presently before the court on the motion of defendants Dennis Publishing, Inc. and Dennis Digital, Inc. to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6) or, alternatively, for summary judgment, pursuant to Fed.R.Civ.P. 56. Plaintiff has filed a response in opposition and defendants have filed a reply.

The court finds that the facts and legal arguments pertinent to defendants' motion are adequately presented in the parties' papers, and the decisional process will not be aided by oral argument. Therefore, pursuant to E.D.Mich. LR 7.1(e)(2), the court shall decide the motion on the briefs. For the reasons that follow, the court grants defendants' motion for summary judgment.

### I. BACKGROUND

Plaintiff, Ronald DuPuis ("DuPuis"), is a former Hamtramck police officer who alleges that Dennis Publishing, Inc. and Dennis Digital, Inc. ("defendants") defamed him by publishing a depiction of him shooting his patrol car partner, Prema Graham ("Graham"), with an electronic "Taser" stun gun. Also included as defendants in the lawsuit are various members of the Hamtramck police force, though

these parties are not involved with this motion.

Plaintiff alleges that on November 3, 2005, he and Graham had a disagreement when Graham, who was driving the patrol car, refused his request to stop at a gas station to get a soda. (Second Am. Compl. ¶ 19.) DuPuis insisted that they stop at the gas station, and he tried to grab onto the steering wheel after it became clear that Graham was passing the entrance to the station. (Defs' Mot. to Dismiss 2.) According to Graham's report, DuPuis then pulled out his Taser gun and jabbed three times at Graham, "Tasing" her once in the right outer thigh. (Defs' Mot. to Dismiss 2–3.)

On November 10, 2005, DuPuis was suspended with pay and on November 14, 2005, he was discharged after an internal investigation found him guilty of the Tasing. (Defs' Mot. to Dismiss 4.) Three weeks later, the 31st District Court of Michigan issued a misdemeanor warrant charging DuPuis with assault and battery. (*Id.* at 4.)

The incident soon attracted media attention. On December 6, 2005, the Associated Press printed the story as follows:

HEADLINE: Michigan officer accused of using Taser on partner during fight about soda.

Hamtramck, Mich. (AP)—A police officer has been charged with using a Taser on his partner during an argument over whether they should stop for a soft drink. Ronald DuPuis, 32, was charged Wednesday with assault and could face up to three months in jail if convicted. The six-year veteran was fired after the Nov. 3 incident. DuPuis and his partner Prema Graham began arguing after DuPuis demanded the she stop their car at a store so he could buy a soft drink, according to a police report. The two then struggled over the steering wheel, and DuPuis hit her with his department-issued Taser, the report said.

She was not seriously hurt. Hamtramck police union lawyer Eugene Bolanski said he expected DuPuis to hire a private lawyer. Hamtramck is a city of 23,000 surrounded by Detroit.

(Defs' Mot. to Dismiss 4.) Maxim, a monthly men's magazine published by defendants, reprinted the story in its March 2006 issue in an article featuring "the dumbest feats performed by people across this great yet surprisingly stupid land." (*Id.* at 4.) The Maxim story read as follows:

SHOCK COP

Michigan

A thirsty police officer Tasered his partner when she refused to stop their patrol car so he could get a soda. Ronald DuPuis applied the shocker to Prema Graham after he grabbed the steering wheel in an attempt to pull over the cruiser. DuPuis was later fired and charged with assault and could spend three months in the clink. He best defense will be that he understandably went nuts because he lives in Hamtramck, a tiny city with the depressing distinction of being surrounded by Detroit.

(*Id.*) (Defs' Mot. to Dismiss, Ex. L.) The Maxim story was accompanied by a cartoon-like illustration of the incident, which depicted DuPuis grabbing the steering wheel from Graham and Tasing her, while her hand bled and donuts flew in the air. (See Defs' Mot. to Dismiss 4, Ex L.)

At trial on the assault and battery charges, DuPuis was acquitted by a jury. However, DuPuis's efforts to challenge his discharge in arbitration were unsuccessful. The arbitrator noted that the in-car video corroborated Graham's account of the story. (*See* Defs' Mot. to Dismiss, Ex. O.) Ultimately, the arbitrator found that "there is clear and convincing evidence

that Officer DuPuis tasered Officer Graham." (*See* Defs' Mot. to Dismiss, Ex. O. 18.)

In his second amended complaint, DuPuis claims that defendants' statements and drawing "were false and were made with actual malice and in a grossly negligent manner." (Second Am. Compl. ¶ 26.) In Count III, DuPuis alleges that defendants' publication of the story placed him in a false light and invaded his privacy. (*Id.* ¶ 37.) In Count IV, DuPuis asserts a defamation claim against defendants, arguing that the statements were not privileged and were defamation per se. (*Id.* ¶¶ 41–42.)

## II. *ANALYSIS*

 In Michigan, a communication is defamatory if it "tends to harm the reputation of a person so as to lower him in the estimation of the community or deter others from associating or dealing with him." *Am. Transmission, Inc. v. Channel 7 of Detroit, Inc.*, 239 Mich.App. 695, 702, 609 N.W.2d 607 (2000). The court must determine, as a matter of law, whether the statements are reasonably capable of a defamatory interpretation, and if they are not then summary judgment is appropriate. *See Ireland v. Edwards*, 230 Mich. App. 607, 619, 584 N.W.2d 632 (1998). If the defendant can show that the statements are factual and truthful, they are not defamatory. *See Rouch v. Enquirer & News of Battle Creek*, 427 Mich. 157, 203–206, 398 N.W.2d 245 (1986). Nevertheless, a defendant does not bear the burden of proving truth; rather, the plaintiff must prove that the statements were false and that the defendant was negligent in its reporting. *See id.*

 The defendants argue that their statements regarding the incident are substantially true and accurately based on public records and reliable news accounts. The court is persuaded by these defenses.

First, defendants highlight the consistency between their statements and the relevant public records. (See Defs' Mot. to Dismiss 8–9.) Each of the following documents, which are attached as exhibits to the motion, substantiate defendants' statements: (1) Graham's police report (Ex. A); (2) the Hamtramck police supervisor's formal complaint against DuPuis (Ex. C); (3) the police investigator's report, the police department's Notice of Disciplinary Action (Ex. E); (4) the Notice of Termination (Ex. F); and (5) the misdemeanor warrant for DuPuis's arrest (Ex. G). M.C.L. § 600.2911(3) states that a publication of public records and proceedings is privileged and not actionable:

> Damages shall not be awarded in a libel action for the publication or broadcast of a fair and true report of matters of public record, a public and official proceeding or of a governmental motive, announcement, written or recorded report or record generally available to the public, or act or action of a public body, or for a heading of the report which is a fair and true headnote of the report.

Defendants' statements indeed derived from a "fair and true report," especially since the report need only be "substantially" accurate and not 100% accurate. *Koniak v. Heritage Newspapers*, 198 Mich. App. 577, 579–580, 499 N.W.2d 346 (1993). Defendants need not prove they actually relied on, or even consulted, these reports. It suffices that their statements are consistent with such sources. Furthermore, DuPuis's argument that M.C.L. § 600.2911(3) requires the broadcast to be attributed to the public source is incorrect. Nowhere in this statute, or in case law, is it suggested that such a broadcast requires citation to the public record.

Second, defendants emphasize their reliance on the original AP story, and how they made no material change to this version. Cited in its motion is Michigan's

recent adoption of the "wire service defense." In *Howe v. Detroit Free Press, Inc.*, 457 Mich. 871, 586 N.W.2d 85 (1998), the Supreme Court protected the reprinting of seemingly trustworthy news stories:

> [Where] defendant reproduce[s], without substantial change, an apparently accurate article released by a reputable news-gathering agency ... and there is nothing in the content of the article itself that could have reasonably placed the defendant on notice of potential inaccuracy ... defendant ha[s] no duty to independently verify the accuracy of the article, and summary disposition in favor of the defendant [is] proper.

Both the AP and the Detroit Free Press had printed the story a few months before defendants featured it in its magazine and online. Plaintiff has responded to the wire service defense by arguing that defendants "substantially changed" the story by failing to note that it originally derived from a public report. This argument is incorrect, as the cases do not require defendants to take such steps to properly employ the wire service defense. *See, e.g., Howe v. Detroit Free Press, Inc.*, 219 Mich.App. 150, 555 N.W.2d 738 (1996). Furthermore, as discussed below, the dramatic additions to the story such as illustrations and subtitles also fail to constitute a substantial change under the wire service defense.

■ DuPuis's second amended complaint alleges that defendants' drawing was false and made in a grossly negligent manner. (Second Am. Compl. ¶ 26.) Defendants counter these characterizations of DuPuis's conduct as constitutionally protected opinion and rhetorical hyperbole under the first amendment. Central to this argument is the notion that the illustration was intended for humor, and it was reasonably perceived by readers as such. Humor at an individual's expense is typically deemed to fall into the opinion category, as it usually falls short of being interpreted as conveying facts. *See Hustler Magazine v. Falwell*, 485 U.S. 46, 50, 57, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). If an illustration is not "reasonably believable" and is clearly exaggerated to enhance the humor or contribute to the parody, there is no defamation. *Id.* at 57, 108 S.Ct. 876 (parody depicting TV televangelist Jerry Farwell involved in an incestuous relationship was not actionable because the viewer could not have reasonably inferred the parody to represent any actual facts).

This notion of the "reasonably believable" extends beyond humorous representations. Even a publication that is crude or mean-spirited may constitute what the United States Supreme Court calls "rhetorical hyperbole" or a "vigorous epithet." *Greenbelt Co-op. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). The Court has also noted that as long as the publication refers to a matter of public concern, it must be "provable as false" before any liability may be accessed under a state defamation claim. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Applying these standards, the court in *Ireland v. Edwards*, 230 Mich. App. 607, 617–618, 584 N.W.2d 632 (1998), found that a public communication that a mother was "unfit" and that she "never spent a moment with [her] child" did not constitute defamation, but was viewed as "rhetorical hyperbole."

The context of the publication is also crucial in determining whether it may be deemed to convey facts and, thus, possibly defamatory. *See Greenbelt*, 398 U.S. at 19, 90 S.Ct. 1537. A communication in a reputable news magazine may be deemed defamatory while that same communication would fall far short of such meaning if delivered in a stand-up comedy routine or pornographic magazine. *See, e.g., Polygram Records, Inc. v. Superior Court*, 170 Cal.App.3d 543, 556–557, 216 Cal.Rptr. 252

(1985) (finding a comedian's statement that a brand of wine should advertise with the slogan "tastes like urine" was not actionable, as it was made during a stand-up routine where humorists are given broader first amendment rights to criticize.) Ultimately, whether a statement may be reasonably interpreted as defamatory, especially with respect to its context, is an issue of law for the court to decide. In this case, Maxim is a men's lifestyle magazine, known for articles and reports that satirize and belittle public figures and those making headlines. This context supports defendants' position that its depictions were not meant to convey facts.

The language and illustrations featured around the defendants' story also fall into this category of rhetorical hyperbole. The specific subtitles, captions, and illustrative components of the publication do not assert objective facts; instead they collectively color the story with sarcasm and exaggeration. In this sense, the title "Idiot Nation" and subtitle "National Disgrace" serve to complement and enhance the story—not assert identifiable facts. Moreover, the flying objects in the air during the Tasing (Graham's hat, her communicator, and two donuts) seem to function as merely a humorous backdrop to the story.

■ DuPuis also includes a false-light invasion of privacy claim in Count III of his complaint. There is no Michigan statute setting out a cause of action for false light invasion of privacy, but relevant Michigan case law clearly establishes it as actionable in tort. To state a claim for false light invasion of privacy a plaintiff must show: (1) that the defendant broadcast to the public in general, or to a large group of people, and (2) the broadcast reveals information that is "unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and place the plaintiff in a false position." *Derderian v. Genesys Health Care Sys.*, 263 Mich.App. 364, 385, 689 N.W.2d 145 (2004) (*citing Duran v. Detroit News*, 200 Mich.App. 622, 631–632, 504 N.W.2d 715 (1993)). Defendants correctly argue that this claim fails for the same reasons that invalidate the defamation claim—namely, that the defendants' story is not false and that they reasonably relied on the news wire.

For the aforementioned reasons, which include defendants' reliance on the AP news wire, corroboration of the relevant public records, and context surrounding the publication, the false-light claim fails.

For the reasons stated above, the court shall grant defendants' motion for summary judgment under Fed.R.Civ.P. 56, as it relates to both counts III and IV of the second amended complaint. Summary judgment, as opposed to dismissal under rule 12(b)(6), is appropriate in this case since the defendants have utilized information outside of the pleadings (i.e., the exhibits attached to the defendants' motion, such as the Hamtramck Police Department's Notice of Disciplinary Action against DuPuis, and the Arbitrator's Opinion and Award.) As for the defamation claim, as a matter of law the statements are incapable of defamatory interpretation. First, defendants' statements regarding the incident are substantially true and accurately based on public records and reliable news accounts. Second, the accompanying illustration and captions are constitutionally protected opinion and rhetorical hyperbole. Finally, the false-light invasion of privacy claim fails for the same reasons as the defamation claim. Accordingly, 06–14927

IT IS ORDERED that defendants' motion for summary judgment is granted.