**David TAUB, Plaintiff,**

v.

**McCLATCHY NEWSPAPERS, INC., and The Associated Press, Inc., Defendants.**

**Civil Action No. 9:05–678.**

United States District Court, D. South Carolina, Beaufort Division.

Aug. 7, 2007.

C. Scott Graber, Esquire, Harold F. Kuhn, Jr., Esquire, Beaufort, SC, for Plaintiff.

Carl F. Muller, Esquire, Greenville, SC, for Defendants.

## AMENDED ORDER

SOL BLATT, JR., Senior District Judge.

This matter is before the Court upon the Defendants' motion for summary judgment. Based on the reasons discussed at the previous hearings and the reasons set forth herein, the Court grants in part and denies in part the Defendants' motion.

## BACKGROUND

In February of 2005, Plaintiff David Taub ("Taub") filed his complaint against a newspaper publisher, Defendant McClatchy Newspapers, Inc. ("McClatchy"), and a wire service, The Associated Press, Inc. ("AP"), in the Beaufort County Court of Common Pleas. On March 3, 2005, the Defendants removed the action to this Court, alleging diversity jurisdiction pursuant to 28 U.S.C. § 1332. On September 1, 2005, the Plaintiff filed an amended complaint.

In his complaint, the Plaintiff, a former mayor of Beaufort and a current member of the Beaufort–Jasper Water & Sewer Authority, asserts that the Defendants published to third parties the allegedly false and defamatory representation that the Plaintiff had been found guilty of the crime of illegally importing monkeys. At issue are the following articles: (1) the original article written by *The Beaufort Gazette* [1] ("*Gazette*") and published in both the print and online versions of the *Gazette;* and (2) the article as altered and distributed by the AP through its wire service, also appearing on the *Gazette* website.

The original *Gazette* article ran on December 18, 2004, and was titled, "Former Beaufort mayor reaches plea agreement." The AP picked up and altered the *Gazette* article, changing the title to read, "Former Beaufort mayor guilty of illegally importing monkeys." The *Gazette* website then automatically picked up the AP article; therefore, both the original *Gazette* article and the AP article appeared on the *Gazette* website.[2] On February 2, 2005, the *Gazette* ran a correction in the print version of the newspaper. The correction stated:

> A story in the Dec. 18, 2005, Gazette misstated the subject of a plea agreement involving Labs of Virginia, a company of which former Beaufort Mayor David Taub was president. The action was taken against the company, not Taub, for the illegal importation of monkeys from Indonesia. All charges against Taub were dismissed.

There is no evidence that this correction appeared on the *Gazette* website. Likewise, there is no evidence that this correction did not appear on the *Gazette* website. Nevertheless, at some point after the *Gazette* ran the print correction, it took its

1. Defendant McClatchy owns, operates, and manages the *The Beaufort Gazette.*

2. While the record is somewhat contradictory on this point, the parties admit in their second supplemental memoranda that both the original *Gazette* article and the altered AP article appeared on the *Gazette* website.

original article off of the website.[3] The *Gazette* also allegedly removed the AP article from its website some time thereafter; however, at the most recent hearing in May of 2007, a search of the *Gazette* website revealed a truncated version of the AP article (including the "Mayor guilty ..." headline). Shortly after the hearing in May of 2007, the truncated version of the AP article was removed.

## I. The Defendants' Motion for Summary Judgment

On June 30, 2006, the Defendants filed a motion for summary judgment, asserting that the published articles are substantially true, that they are privileged as neutral reporting and fair comment, and that the Plaintiff cannot prove actual malice by clear and convincing evidence. The Plain-

tiff responded in opposition to the Defendants' motion, and the Defendants filed a reply. On September 27, 2006, the Court held the first of three hearings on the Defendants' motion. At this first hearing, the Court determined that further briefing was necessary on the issue of whether the Plaintiff qualified as a public official and/or a public figure, such that the Plaintiff would need to prove that the Defendants acted with actual malice.

After the parties submitted their supplemental briefs, the Court held a second hearing on February 7, 2007, during which the Court determined that the original *Gazette* article (the article that appeared in the print version of the newspaper) was substantially true in light of paragraph 19 of the plea agreement and a letter written and signed by Taub.[4] Additionally, the

---

3. According to the deposition of Christian Yates, the website manager, at some point in 2005 or 2006, Executive Editor Steve Blust called him and asked him to remove from the website the article with the headline, "Former Beaufort mayor reaches plea agreement," which was the original *Gazette* article. Yates then sent an email to McClatchy Interactive to have the article removed from the website. However, because Blust only asked Yates to remove the article with the headline, "Former Beaufort mayor reaches plea agreement," Yates did not ask McClatchy Interactive to also remove the AP article from the website. Interestingly, the Plaintiff states in his second supplemental memorandum that Yates testified that he knew that the AP version of the article was on the website when Blust asked him to remove the original *Gazette* article.

4. Paragraph 19 of the Plea Agreement states in pertinent part:

Defendant LABS, by its authorized representative and on behalf of the members of the Board of Directors at the time of the allegations in the indictment, including Stern, Henley, and Taub, agrees that during the period of probation imposed in this case, Stern, Henley, and Taub will have no personal involvement in any application for a license from the United States Fish and Wildlife Service to import wildlife or any importation of wildlife after any such li-

cense application is granted. Stern, Henley and Taub each understand that in the event of a violation of this paragraph, the government, at its option, may move to vacate the Plea Agreement as to the particular individual defendant or defendants who violated this paragraph, rendering the Plea Agreement null and void as to that particular defendant or defendants not subject to any of the limits set forth in this Agreement.... Stern (in his individual capacity), Henley, and Taub are not signatories to this Plea Agreement but Defendant LABS, by its authorized representative, acknowledges that it has received the specific approval of these individuals to abide by the representations of this paragraph.

Also, Plaintiff Taub signed a letter to co-Defendant Stern, wherein Taub wrote, "I have reviewed Paragraph 19 of the Plea Agreement, dated August 18, 2004, and I agree to abide by the terms of said Paragraph 19."

Moreover, in contrast to the Plaintiff's arguments otherwise, logic dictates that in order for the government to be able to "move to vacate the Plea Agreement as to the particular individual defendant or defendants who violated this paragraph, rendering the Plea Agreement null and void as to that particular defendant," such defendant must in fact be bound by the Plea Agreement or at least bound by Paragraph 19. Thus, in light of the

Court determined that even if the print article was not substantially true, the Plaintiff qualified as a public official who must prove actual malice, which the Court found that the Plaintiff could not do. Next, the Court granted summary judgment to Defendant AP on the basis that the record contains absolutely no evidence that the AP writers entertained serious doubts as to the truth of the publication, with specific reference to the headline using the word "guilty." In other words, the Court found no evidence of actual malice on the part of the AP. Then, at some point near the end of this hearing, the issue of the *Gazette* website was brought to the Court's attention. As previously mentioned, both the original *Gazette* article, which the Court found to be substantially true, and the AP article appeared on the *Gazette* website. Because neither party had briefed the issue of the website to the Court, the Court again granted the parties time to submit supplemental briefs.

Following the filing of the parties' second supplemental briefs, the Court held a third hearing on May 22, 2007, during which the Court heard arguments regarding the nature of the *Gazette* website as well as the wire service defense. With respect to the nature of the *Gazette* website, Defendant McClatchy asserted that the AP article automatically appeared on the *Gazette* website via an automated feed, and the article remained on the *Gazette's* active homepage for only seven days before it was moved to a "locked archive," where it was no longer being "published." Defendant McClatchy also argued that there was no evidence that anyone saw the AP article on the *Gazette* website during the first seven days or that the *Gazette* even knew the AP article was on its web-

site during the first seven days. In any event, McClatchy asserted that the wire service defense provides a complete defense for the AP article appearing on the *Gazette* website.

In contrast, the Plaintiff asserted that the article continued to be published when it was moved to the "locked archive." The Plaintiff also argued that the "locked archive" was not in fact "locked," but rather, to remove an article from the website's archive section, someone at the *Gazette* needed only to contact someone at McClatchy Interactive and ask him or her to remove the offending article, which the *Gazette* actually did when it removed the original *Gazette* article from the "locked archive." Based on these arguments, the Court determined the issue to be whether the article continued to be published once it was placed in the archive section of the website. The Court granted the parties ten days to research the issue and submit to the Court informal letters outlining the law of South Carolina on this issue. The matter is now ripe for decision.

## STANDARD OF REVIEW

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition

---

language of Paragraph 19, as well as Taub's signed letter agreeing to abide by the terms of Paragraph 19, the Court found the *Gazette's*

original article, with the "Former Beaufort mayor reaches plea agreement" headline, substantially true.

by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548.

### DISCUSSION

As previously set forth, at the most recent hearing, held on May 22, 2007, the Court heard arguments regarding the presence of the AP article (with the "Mayor guilty ..." headline) on the *Gazette* website. However, because neither party addressed whether South Carolina follows the single publication rule or the continuing publication rule, the Court granted the parties ten days to submit informal letters addressing this issue.

In the Defendant's letter, the Defendant points out that although it could not find a South Carolina case or statute addressing the single publication rule, the majority of other states have applied the single publication rule in general, and some states have applied the rule to the internet specifically. Relying on this majority view, the Defendant argues that the South Carolina Supreme Court should and will adopt the single publication rule both for print and online content when it is presented with such an opportunity. Applying the single publication rule to the facts of this case, the Defendant argues that it is entitled to summary judgment because the wire service defense protects the initial appearance of the AP article on the *Gazette* website, and by the time the Defendant became aware of the inaccuracies of the AP article, the AP article had moved automatically from the active homepage to the "locked archive," where it ceased to be published.

In the Plaintiff's letter to the Court, the Plaintiff concedes that the majority of states have adopted the single publication rule, but the Plaintiff maintains that the minority viewpoint is correct in refusing to apply the single publication rule to internet material. Essentially, the Plaintiff argues this because a website remains under the exclusive control of its owner as opposed to print media, which passes beyond the publisher's control once it is distributed. In addition, the Plaintiff argues that summary judgment is inappropriate even if South Carolina decides to apply the single publication rule because: (1) updating a website creates an exception to the single publication rule because such updates are a substantial change, which constitute a republication; (2) the single publication rule exists solely to create a single cause of action, and both parties stipulate that there is only one cause of action; and (3) the single publication rule does not relate to the issue of constitutional malice.[5]

---

**5.** The Court does not address these arguments because the Court does not find that South

Carolina follows the single publication rule.

## I. The Law of South Carolina

While both parties are correct that South Carolina law is sparse on this issue, the Court uncovered an opinion from the South Carolina Court of Appeals that seems to have some bearing on this case. *Moosally v. W.W. Norton & Co.*, 358 S.C. 320, 594 S.E.2d 878 (S.C.Ct.App.2004).

In *Moosally*, a defamation action involving a book published by W.W. Norton, the South Carolina Court of Appeals first examined whether the circuit court had personal jurisdiction over the defendants. In considering whether the circuit court had personal jurisdiction over defendant W.W. Norton, the court determined that W.W. Norton satisfied the minimum contacts analysis because it "endeavored to exploit the South Carolina market." 358 S.C. at 335, 594 S.E.2d at 886. The court stated:

> W.W. Norton produced discovery documents and responses including a list of approximately 315 bookstores in South Carolina in which W.W. Norton sold books. Many of these books are sold to educational institutions in South Carolina.... Specifically, the Charleston County Public Library has five copies which have circulated at least forty-one times. It is reasonable to assume that a library will disseminate books in its collection. The check-out process and procedure constitutes a separate and distinct dissemination of the books which is, in actuality, a republication.

*Id.*

Next, in determining that South Carolina's door-closing statute did not bar the plaintiffs' action, specifically considering whether the plaintiffs' libel cause of action arose in South Carolina, the court stated: "the dissemination of the book in South Carolina is a continuing libel in each and every instance. The tort of libel occurs wherever the material is circulated. Apodictically, the causes of action as alleged arose in the state of South Carolina." *Id.* at 339, 594 S.E.2d at 888.

Although *Moosally* involved personal jurisdiction and South Carolina's door-closing statute, the court's determination that "[t]he check-out process and procedure constitutes a separate and distinct dissemination of the books which is, in actuality, a republication," as well as the court's finding that "the dissemination of the book in South Carolina is a continuing libel in each and every instance," seems to imply that South Carolina, or at least the South Carolina Court of Appeals, adheres to the continuing publication rule. In light of *Moosally*, this Court cannot state with certainty that South Carolina, if faced with the issue of whether an article continues to be published once it moves to a website's online archive, would follow the single publication rule. To the contrary, the Court believes that the AP article continued to be published, as it was accessible through a search of the website up until the date the article was removed from the *Gazette* website in May of 2007.[6] As a result, the Court finds that the Defendant is not entitled to summary judgment.

Moreover, in considering the nature of the so-called wire service defense, the Court feels strongly that the wire service defense cannot provide a complete

6. The Court does have some issues with the South Carolina Court of Appeals' determination that each distribution of a library book constitutes a separate libel. As a practical matter, the determination seems to render futile South Carolina's statute of limitations for defamation claims. Moreover, in the case of a library book, the original publisher is not even taking measures to reproduce the book. Nevertheless, the Court is bound to follow the law of South Carolina, and at this juncture, the Court cannot find that South Carolina follows or will follow the single publication rule.

defense under the specific facts of this case. First, this case does not present the typical scenario whereby a newspaper publishes an article from a reputable wire service or news agency that the wire service or news agency picked up from a different source. Instead, the article at issue here originated from a *Gazette* article, and the *Gazette* then republished on its website the AP's altered version of its original article. Therefore, the *Gazette* at least had some reason to be aware of the article's inaccuracies. Nevertheless, even assuming that the *Gazette* acted completely reasonably in publishing the AP article on its website,[7] it is clear that at some point the *Gazette* learned of both the article's presence on its website and the article's inaccuracies. It is due to this that the Court cannot in good conscience find that the wire service defense provides a complete defense for the Defendant. *Cf.*, Restatement (Second) of Torts § 577(2) (stating that "one who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication").[8]

## CONCLUSION

Based on the reasons discussed at the previous hearings and the reasons set forth herein, It is **ORDERED** that

(1) the Defendants' motion for summary judgment is granted as to Defendant AP;

(2) the Defendants' motion for summary judgment is granted as to Defendant McClatchy with respect to the *Gazette's* original article;

(3) the Defendants' motion for summary judgment is denied as to Defendant McClatchy with respect to the AP article's presence on the *Gazette* website.

**IT IS SO ORDERED.**[9]

---

7. The Court recognizes the purpose of the wire service defense and realizes that requiring a newspaper to scour every article received from a reputable wire service or news agency would place too heavy a burden on the newspaper. After all:

"No newspaper could afford to warrant the absolute authenticity of every item of its news, nor assume in advance the burden of specially verifying every item of news reported to it by established news gathering agencies, and continue to discharge with efficiency and promptness the demands of modern necessity for prompt publication, if publication is to be had at all."

*Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234 (Fla.1933).

8. In *Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 517–18, 506 S.E.2d 497, 505 (1998), the South Carolina Supreme Court cited section 558 of the Restatement of Torts (Second) to define the elements of defamation. Section 558 refers to section 577 of

the Restatement for its definition of publication; section 577(2) states that "one who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication." Restatement (Second) of Torts § 577(2). Although a website may not constitute chattel in the traditional sense, section 577 lends credence to the Court's belief that the Defendant may have acted unreasonably and/or recklessly by failing to remove from its website the offending article after it learned of both the article's presence and the article's inaccuracies.

9. This Court cannot end this Order without expressing its gratitude to its career law clerk, E. Nanette Swalm, and to its summer intern, William C. Cleveland, IV, for the hours they spent in reviewing and analyzing the applicable legal principles involved in this novel and newly-evolving field of law to enable this Court to prepare its Order in this case.