DECISION
Before this Court are Defendants Katherine Gregg's ("Gregg's") and The Providence Journal Company's ("ProJo's") Motion to Dismiss Plaintiffs' Complaint, as well as a Motion to Reconsider filed by Plaintiffs following the granting of Dan Yorke's ("Yorke's") Motion to Dismiss. In order to clarify this Court's reasoning in granting Yorke's Motion to Dismiss, both filings will be addressed herein.
 I FACTS AND TRAVEL
At this procedural posture, all of the facts alleged by Plaintiffs are to be taken as true. Accordingly, the facts are as follows: Robert Burke ("Burke") is the Vice President of Food and Beverage Corp., and of BOEA which do business as Pot au Feu Restaurant, and as Federal Reserve Special Events, respectively. (Pl.s' Compl. ¶ 1.) From 2006-2008, House Speaker William Murphy hosted a St. Patrick's Day luncheon at the Federal Reserve called the "Murphy's Law Luncheon." (Id. ¶ 8). Prominent Rhode Island businesspeople and politicians attended the luncheon, where some of the attendees *Page 2 
roasted other attendees, usually politicians. (Id.) From 2006-2008, the event had been open to the press. (Id.) In 2009, Speaker Murphy requested "that jokes, gags and punch lines said or displayed at the event would be `off the record.'" (Id. ¶ 9.) Prior to the event, Gregg, a Providence Journal reporter, phoned Burke to protest the `off the record' rule. (Id. ¶ 10.) Burke responded that the rule was not imposed by him but by Speaker Murphy. (Id.) That same day, a spokesperson for Speaker Murphy emailed Gregg with regard to the `off the record' rule, and Gregg replied by email to again protest the rule. (Id.)
The luncheon took place on March 17, 2009. (Id. ¶ 11) On March 20, Gregg emailed Burke, again attributing the `off the record' rule to him. (Id.) Burke again repudiated the accusation, calling it "repugnant and false." (Id. ¶ 12.) On March 23, 2009, Gregg authored in part an article published by ProJo entitled "Rhode Island's Grand Old Party Putting on a Brave Front." ("The Article") (Id. ¶ 14.) Portions of the Article stated:
 "In Rhode Island House Speaker William J. Murphy and his host — restaurateur and frequent State House vendor Robert Burke, banned reporters from disclosing what Murphy had to say at what was billed as the fourth-annual Murphy's Law Luncheon . . . [O]ne of the hoped-for side effects of the event is to lessen the polarization that has become rife in our politics, Burke said in a recent exchange of emails. He said he imposed the off-the-record rule because he felt a former Journal columnist took a Murphy quip about homosexuals, at an earlier St. Patrick's Day lunch, out of context . . . creating an impression of an event that is mean-spirited." (Id.)
Yorke is the host of a talk show on WPRO-AM and WEAN-FM in Providence. (Id. ¶ 19). On March 23, 2009 Yorke read the Article co-authored by Gregg. During his radio broadcast, Yorke referred to the Gregg Article, and stated several disparaging *Page 3 
opinions of Burke, including: "That Bob Burke thinks he can control the First Amendment"; "You can kiss my Irish ass. You manipulative piece of garbage"; "I wouldn't buy a napkin from the guy for the rest of my life . . . you will never see me at any one of his two places because he stinks of the full Rhode Island"; "Rhode Island needs an enema and it ought to start with Bob Burke"; "What an absolute disgrace this guy is"; "And stupid Bob Burke. He's too stupid. He's a stupid person. He's too stupid to understand that I don't have, have a problem with the event. I have a problem with the gag order"; "You punk, mob type actor. You B mob actor Bob Burke. You're going to threaten me with coppin' Buddy Cianci's name. Like I'm going to wobble and fall over, over what? You punk!" (Id. ¶ 20.) Although Burke was unaware of the Article or of Yorke's statements on his show, he was phoned by two individuals who advised him of Yorke's statements on the air. (Id. ¶ 21). Burke called in to Yorke's show and was put on the air "in an attempt to discern from Yorke why [Yorke] was disparaging him." (Id.)
On March 19, 2010 Plaintiff filed his Complaint, alleging: libel on behalf of Burke against Gregg and ProJo for publishing the Article; slander and libel on behalf of Burke against Yorke and Citadel Broadcasting Corporation ("Citadel") for the statements Yorke made on the air; libel and slander on behalf of Food and Beverage Corp. d/b/a Pot au Feu Restaurant against Yorke and Citadel; libel and slander on behalf of BOEA d/b/a Federal Reserve Special Events against Yorke and Citadel; breach of certain advertising contracts on behalf of BOEA and Food and Beverage Corp. against Citadel; and interference with prospective contracts on behalf of all Plaintiffs against Yorke and Citadel. *Page 4 
On May 11, 2010 Citadel moved to dismiss on the basis that it is under federal bankruptcy protection. (See Citadel Mot. to Dismiss.) On the same day, Yorke filed a Motion to Dismiss. Arguments were heard by this Court on July 27, 2010, at which time this Court granted Yorke's Motion to Dismiss. Because the claims against Citadel were derivative, this Court did not address Citadel's bankruptcy argument. Subsequent to this Court's ruling, Plaintiffs filed supplemental memoranda, which will be considered as a Motion to Reconsider. On September 20, 2010, Defendants Gregg and ProJo filed a Motion to Dismiss. This Court will take the opportunity to succinctly address each of the Parties' arguments below.
 II STANDARD OF REVIEW
"The Superior Court Rules of Civil Procedure, similar to the Federal Rules of Civil Procedure, do not provide for a motion to reconsider. This Court, however, applies a liberal interpretation of the rules to look to substance, not labels. Historically, [this Court has] allowed "motions to reconsider" to be treated as motions to vacate under Rule 60(b). . . ." Sch. Comm. of City ofCranston v. Bergin-Andrews, 984 A.2d 629, 649 (R.I. 2009) (internal quotations and citations omitted). Rule 60(b) allows for relief from a judgment or order for inter alia, mistake, inadvertence, excusable neglect, and for "any other reason justifying relief from the operation of the judgment." Super. R. Civ. P. 60(b). "A motion to vacate a judgment is left to the sound discretion of the trial justice and such a ruling will not be disturbed absent an abuse of discretion." Malinou v. SeattleSav. Bank, 970 A.2d 6, 10 (R.I. 2009). *Page 5 
"[T]he sole function of a motion to dismiss is to test the sufficiency of the complaint." Barrette v. Yakavonis,966 A.2d 1231, 1234 (R.I. 2009) (quoting Palazzo v. Alves,944 A.2d 144, 149 (R.I. 2008)). "`The grant of a Rule 12(b)(6) motion to dismiss is appropriate when it is clear beyond a reasonable doubt that the plaintiff would not be entitled to relief from the defendant under any set of facts that could be proven in support of the plaintiff's claim.'" Id. (quotingPalazzo, 944 A.2d at 149-50). In conducting this analysis, a trial justice should assume all the allegations in Plaintiffs' complaint to be true, and view them in the light most favorable to the plaintiff. Palazzo, 944 A.2d at 149 (citing Ellis v.Rhode Island Public Transit Auth.,586 A.2d 1055, 1057 (R.I. 1991)).
 III DISCUSSION A Gregg's and ProJo's Motion to Dismiss
In order to state a claim for defamation, "a plaintiff must prove: `(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) damages, unless the statement is actionable irrespective of special harm.'" Marcil v. Kells, 936 A.2d 208, 212 (R.I. 2007) (quoting Lyons v. Rhode Island Pub. Emps. Council 94,516 A.2d 1339, 1342 (R.I. 1986)). See also Restatement (Second) of Torts § 558 (1977). Whether a particular statement is defamatory "is a question of law for the court to decide rather than a factual issue for a jury to determine." Id. (citingAlves v. Hometown Newspapers, Inc.,857 A.2d 743, 750 (R.I. 2004)). A statement is defamatory if it is "`false and malicious, imputing conduct which injuriously affects a mans [sic] reputation, *Page 6 
or which tends to degrade him in society or bring him into public hatred and contempt. . . .'" Id. (quoting Reid v.Providence Journal Co.,20 R.I. 120, 124-25, 37 A. 637, 638 (1897)). A statement can be defamatory on its face or by innuendo. Id. (citingAndoscia v. Coady,99 R.I. 731, 735, 210 A.2d 581, 584 (1965)). "[T]he decisive question is what the person or persons to whom the communication was published reasonably understood as the meaning intended to be expressed." Id. (quoting Restatement (Second) of Torts § 563 cmt. e. at 164 (1977)). "Words alleged to be defamatory must be considered in the context in which they appear."McCann v. Shell Oil Co., 551 A.2d 696, 698 (R.I. 1988) (citingLyons, 516 A.2d at 1343). "The alleged defamatory language is not to be enlarged beyond the natural meaning of the words actually used." Id. (citing Ogrodnick v. Providence JournalCo., 93 R.I. 316, 318, 175 A.2d 289, 291 (1961)). "Language is not to be forced or tortured in libel cases in order to make it actionable." Id. (citing Reid, 20 R.I., 37 A.).
Here, Plaintiffs' Complaint alleges that the Article falsely attributed the media restriction at the private luncheon to Burke. Taken in its context, [1] the Article communicates to its reader that Burke, as the owner of the venue where the luncheon was held, initiated the media restriction to ensure that edgy or slightly off-color jokes would not be taken out of context and result in a misapprehension of the event. This is not the type of comment that would injuriously affect Burke's reputation, as a restaurateur or otherwise, degrade him in society, or bring him into public hatred or contempt.See Marcil, 936 A.2d at 212. In fact, here, even though the article erroneously attributed the *Page 7 
media restriction to Burke, it offers a perfectly valid and logical reason for the rule that would prevent the media from reporting on statements made during this private social event — that some of the jokes during this `roast' may be off-color, and that they should not be taken out of context in a way that may potentially offend those who later hear them.[2] While a reader may disagree with the decision to so restrict the media, this Court finds that attributing the restriction to Burke would not injuriously affect his reputation, degrade him in society, or bring him into public hatred and contempt. Accordingly, the Article is incapable of defamatory meaning. Marcil, 936 A.2d at 212.
The fact that Yorke read the Article and drew disparaging opinions about Burke does not change this Court's analysis, nor does the fact that Burke considered those accusations "repugnant and false." (Pl.s' Compl. ¶ 12.) A set of untrue but non-defamatory statements may lead a third party to form a pejorative opinion about the subject of that statement. In that case, because the underlying statement is not defamatory, the speaker cannot be liable for defamation. This concept is best illustrated by way of an example. A publishes to B that C is a Capricorn, when in fact C is a Sagittarius. B, being an astrology aficionado, repeats the claim to his neighbors and friends, and follows by expounding upon all of the negative virtues C must have by virtue of being a Capricorn. The fact that B, perhaps irrationally and bombastically, drew *Page 8 
certain conclusions about C based on misstated facts does not alter the notion that those misstated facts are not defamatory. This remains true even if C would find being labeled as a Capricorn "repugnant and false."
Plaintiffs point to the case of Della Posta v. Rand ExpressFreight Lines, Inc. for the proposition that the determination of whether the Article is defamatory is a question for the jury, because the language is to be considered with other contextual circumstances. 86 R.I. 145, 154, 133 A.2d 775, 779 (1957). While this proposition is generally true, its application here is without merit. Della Posta involved an employer who terminated the plaintiff and, in the presence of a third party, stated "[w]e don't want men of your calibre around here." Id. at 154, 778. While that statement is not ordinarily capable of defamatory meaning, the jury was able to conclude that it was defamatory because they found that that statement alluded to a letter, which was known to all of the parties to the conversation, and which referred to the plaintiff as a thief. Id. at 155, 779. Here there is no such allegation of an allusion, nor can one properly be made. Rather, the facts of this case are more analogous to Marcil, in which the plaintiff "offer[ed] no extrinsic factors known to [the recipient of the allegedly defamatory statement] that would support the proposition that [the speaker's] statement connoted defamation. . ."936 A.2d at 215. "Unlike the words used in Della Posta, none of the words defendant [] used even is susceptible to a secondary defamatory meaning." Id. As such, Gregg's and ProJo's Motion to Dismiss must be granted. *Page 9 
 B Yorke's and Citadel's Motion to Dismiss
The crux of Plaintiffs' claims against Yorke (and derivatively against Citadel) is that Yorke read the Article and formulated from it various negative and allegedly defamatory opinions, which he communicated during his radio show. (Pl.s' Compl. ¶¶ 19-25.) This Court has already heard and decided Yorke's Motion to Dismiss, as detailed infra. Plaintiffs then filed a Motion to Reconsider. Subsequent to this Court's ruling on Yorke's Motion to Dismiss, Gregg and ProJo also moved to dismiss on the grounds that the article was not capable of defamatory meaning, discussed supra.
Plaintiffs' Motion to Reconsider
Plaintiffs ask this Court to hold Yorke liable for his statements of opinion in response to reading the Article. In a bench decision given on July 27, 2010, this Court granted Yorke's Motion to Dismiss on the grounds that Yorke was expressing an opinion based on disclosed, nondefamatory facts. (See Tr., 14-17.) Implicit in the Court's prior ruling was the holding that the facts upon which the opinions were premised were not defamatory. (Id. at 17.) This court also alluded to, without relying on, the notion that a speaker uttering otherwise defamatory statements may nonetheless be protected from liability based on public policy considerations. (Id.) This Court will take Plaintiffs' Motion to Reconsider as an opportunity to clarify its earlier position on Yorke's Motion to Dismiss.
This Court's prior holding stated that Yorke's statements were not actionable because they were opinions based upon disclosed, nondefamatory facts. "[A] statement in the form of an opinion may be defamatory and therefore actionable if and only if `it *Page 10 
implies an allegation of undisclosed defamatory facts as the basis for the opinion.'" Budget Termite Pest Control,Inc. v. Bosquet, 811 A.2d 1169, 1173 (2002) (quotingBeattie v. Fleet Nat'l Bank, 746 A.2d 717, 721 (R.I. 2000)). This is because "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Id. (quoting Gertz v.Robert Welch, Inc.,418 U.S. 323, 399-40, 94 S. Ct. 2997, 3007, 41 L. Ed. 2d 789, 805 (1974)). This rationale was succinctly stated more than one hundred and fifty years ago by British Political philosopher John Stuart Mill, who stated:
 "If even the Newtonian philosophy were not permitted to be questioned, mankind could not feel as complete assurance of its truth as they now do. The beliefs which we have most warrant for have no safeguard to rest on but a standing invitation to the whole world to prove them unfounded." John Stuart Mill, On Liberty
81(The Penguin English Library 1974) (1859).
"Therefore, `if the non-defamatory facts underlying an * * * opinion are publicly known or disclosed, the opinion, justified or unjustified, is privileged as a matter of law.'" Cullen v.Auclair, 809 A.2d 1107, 1110 (R.I. 2002) (quotingBeattie, 746 A.2d at 721). In the instant case, the underlying Article is not capable of defamatory meaning, as discussedsupra. Plaintiffs have alleged in their Complaint that Yorke referred to the Article during his broadcast. (Pl.s' Compl. ¶ 20(i).) The Supreme Court's holding in Beattie is equally applicable here — "[w]hen the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the *Page 11 
existence of additional, undisclosed [defamatory] facts."746 A.2d at 721 (quoting Standing Comm. on Discipline v.Yagman, 55 F.3d 1430, 1439 (9th Cir. 1995)).
Separate and apart from the fact that Yorke's opinions were based on disclosed, nondefamatory facts, this Court alluded to public policy considerations that would preclude Yorke's liability. In its bench decision, this Court cited to a body of Rhode Island case law "that prefers immunity to publishers if the statements are made in good faith and the publisher reasonably believes that he or she has a legal, moral, or societal duty to speak out. . . ." (Tr. at 17.) The Court referred to Mills v. C.H.I.L.D.,Inc., not for the specific rule of law set forth therein, but for the proposition that there are times when public policy concerns would crystallize to offer added protection in the defamation context. 837 A.2d 714 (R.I. 2003). This Court agrees with Plaintiffs that the holding articulated in Mills has no direct application to this case. Mills provides a qualified
privilege in defamation cases "if the publisher makes the statements in good faith and `reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect either his own interests, or those of third person[s], or certain interests of the public.'" 837 A.2d at 720 (quotingPonticelli v. Mine Safety Appliance Co.,104 R.I. 549, 551, 247 A.2d 303, 305-06 (1968)). The qualification here is that "`reciprocity of duty' must exist between the publisher of the statement and the recipient, such that the latter has an interest in receiving the information that corresponds to that of the publisher in communicating it." Id. (quotingPonticelli, 104 R.I. at 551, 247 A.2d at 306). As with most other qualified privileges in the defamation context, this qualified privilege is overcome by a showing of ill will or malice.Id. (citing DiBiasio v. Brown Sharpe Mfg. Co.,525 A.2d 489, 492 (R.I. 1987)). *Page 12 
Thus, this Court cited to Mills not to apply its holding to the case at bar, but to highlight that the point of law Plaintiffs take from Martin v. Wilson Publishing Co. — that a republisher of a defamatory statement is just as culpable as the original publisher — is not absolute. 497 A.2d 322 (R.I. 1985). InMartin, the plaintiff was a real estate investor buying up certain properties in the village of Shannock in southern Rhode Island. Id. at 324. A local newspaper reported on the residents' apprehension towards plaintiff, and alluded to town rumors, stating "[s]ome residents stretch available facts when they imagine [plaintiff] is connected with the . . . rash of fires in the village . . . The same imaginations note that the fire at the old Shannock mill before he bought it made it cheaper (but less valuable), or that the fire there since he bought it might have been profitable. . ." Id. at 325. Plaintiffs cite toMartin for the proposition that "one who republished libelous or slanderous material is subject to liability just as if he had published it originally. Id. at 327 (citing Cianci v.New Times Pub'g Co., 639 F.2d 54, 60-61 (2d Cir. 1980)). The important factual distinction between Martin and the case at bar is that in Martin, "the newspaper essentially reported the existence in Shannock of false, defamatory rumors circulating about town connecting [plaintiff] with a rash of incendiary fires, despite the fact that the newspaperhad no belief in the underlying truth of such rumors."Id. at 325 (emphasis added). This holding is solicitous of the fact that some degree of fault is required in all defamation cases.See Marcil, 936 A.2d at 212.
In the instant case, Yorke cited an article appearing in a reputable newspaper, the Providence Journal. Plaintiffs have not alleged that Yorke had or should have had any reason to know that the article was untrue, and they have conceded that they are unable to allege any malice or ill will on his part. (See Tr. 22.) This brings Plaintiffs' case within *Page 13 
the framework of the wire service defense, explicitly applied in a growing number of states.[3] While a republisher of defamatory material is subject to liability "just as if he had published it originally, Martin, 497 A.2d at 327, "[t]his rule does not . . . excuse the plaintiff in a case such as this one from making the constitutionally required showing of fault on the part of the publisher." Appleby v. Daily Hampshire Gazette,395 Mass. 32, 36, 478 N.E.2d 721, 724 (1985). In order to be held liable for defamation, a defendant must act negligently with regard to ascertaining the truth or falsity of the statement published.See Major v. Drapeau, 507 A.2d 938, 941 (R.I. 1986).See also Restatement (Second) of Torts § 580 B cmts. b, c (1977) (for the proposition that the old common law rule of liability for defamation without fault with regard to the truth of the statement made was declared unconstitutional by the United States Supreme Court in Gertz, 418 U.S.,94 S.Ct., 41 L. Ed. 2d. Accordingly negligence is the minimum degree of fault required to hold a defendant liable for a defamatory statement.
The crux of the wire service defense is that in ordinary circumstances, the republisher of allegedly defamatory materials will not "act[] negligently in relying on the accuracy of a story from a reputable wire service." Appleby,395 Mass. at 38, 478 N.E.2d at 725. "[T]here is no difference between reprinting a wire service story verbatim, and accurately restating its contents." Id. at 40, 726. This holding is reflective *Page 14 
not only of the realities in which smaller market media outlets operate, but of the myriad public policy considerations that militate in favor of a free and unrestrained press.Id. at 38-40, 725-26. In light of the fast-paced world in which our modern media operate, imposing upon them a duty to independently verify stories from reliable sources "would probably force smaller publishers to confine themselves to stories about purely local events." Id. at 39, 725. As a result, smaller media outlets would be unable to compete with their larger counterparts who can afford to verify their facts regardless of their source and/or to litigate such matters; they would be relegated to "confin[ing] themselves to stories about purely local events." Id. This brings to mind the words of United States Supreme Court Justice Stephen J. Field, who stated ""[l]iberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value." Ex parte Jackson,96 U.S. 727, 728 (1877).
While this Court cites to a Massachusetts case for the wire service defense, it is not without a foundation in Rhode Island;Appleby merely speaks to a particular set of factual circumstances that have not yet surfaced in our state. Our own Supreme Court has also assessed a reporter's duty to verify the underlying facts contained in his report. In Trainor v. TheStandard Times et al., the Court stated "with respect to the fair reporting privilege, a reporter is not required to conduct an independent investigation or to verify what is contained in the official document about which he or she is reporting."924 A.2d 766, 772 (R.I. 2007). Such a requirement "would impose an intolerable burden on the press." Id. at 773 (quotingStover v. Journal Pub. Co.,105 N.M. 291, 731 P.2d 1335, 1338-39 (Ct. App. 1985)). While Yorke was not reporting or opining on a public hearing or proceeding here, the same pragmatic considerations require a member of the *Page 15 
press to be shielded from liability for statements that are republished from a reliable news source such as the Providence Journal. Our Supreme Court has also touched upon the culpability of a reporter in failing to independently verify her sources inHall v. Rogers, 490 A.2d 502 (R.I. 1985). AlthoughHall proceeded under the higher standard of actual malice required for a public figure plaintiff in a defamation case, the Court stated that there can be no actual malice in the republication of defamatory material "[a]s long as the sources of the libelous information appeared reliable, and the defendant had no doubts about its accuracy." Id. at 505.
In the case to first enunciate the wire service defense, the Florida Supreme Court stated the pragmatic considerations as such:
 "The mere reiteration in a daily newspaper, of an actually false, but apparently authentic news dispatch, received by a newspaper publisher from a generally recognized reliable source of daily news . . . cannot through publication alone be deemed per se to amount to an actionable libel by indorsement [sic], in the absence of some showing from the nature of the article published, or otherwise, that the publisher must have acted in a negligent, reckless, or careless manner in reproducing it to another's injury. * * * No newspaper could afford to warrant the absolute authenticity of every item of its news, nor assume in advance the burden of specially verifying every item of news reported to it by established news gathering agencies, and continue to discharge with efficiency and promptness the demands of modern necessity for prompt publication, if publication is to be had at all." Layne v. Tribune Co., 108 Fla. 177, 186-88, 146 So. 234, 238-39 (1933).
This Court would be remiss if it failed to address the strong public policy currents flowing below the surface of this decision. One need not look far to find the outer limits of speech that many would find objectionable, but is nonetheless protected in our American society. In popular culture, we see reality television constantly lowering the *Page 16 
bar of civility and common courtesy, celebrity `news' programming relentlessly hounding the famous to report on the mundanity of their everyday lives, and ever-increasing violence and obscenity in video games, music, movies and television. In interpreting our rights of freedom of speech and freedom of the press, the courts have balanced various competing interests with an overarching public interest in maintaining and preserving a vibrant and free press. Seee.g. Brandenburg v. Ohio, 395 U.S. 444 (1969). That balance was struck long ago by the great minds that founded our Nation, and this Court is disinclined to retread upon that reverend ground. Said Alexis de Tocqueville, a foreign scholar curious of our American freedoms:
 "I confess that I do not entertain that firm and complete attachment to the liberty of the press, which things that are supremely good in their very nature are wont to excite in the mind; and I approve of it more from a recollection of the evils it prevents, than from a consideration of the advantages it ensues * * *. If anyone can point out an intermediate, and yet a tenable position, between the complete independence and the entire subjection of the public expression of opinion, I should perhaps be inclined to adopt it; but the difficulty is to discover this position." Alexis de Tocqueville, Democracy in America
177 (John C. Spencer ed., 3rd Amer. ed. 1839).
Even in the debate that raged between the Federalists and the Anti-Federalists over whether our fledgling nation should adopt the Constitution, and whether the Constitution should include a set of explicit and inalienable rights, the inviolability of the freedom of the press was never contested. See The Federalist No. 84 (Alexander Hamilton) (in arguing against the necessity of a Bill of Rights, asking "[w]hy, for instance, should it be said that the liberty of the press shall not be restrained, when no power is given by which restrictions may be imposed?"); The Anti-Federalist Paper Nos. 4, 6 (The Federal Farmer), No. 1 (Centinel) (in extolling the virtues of explicit protection *Page 17 
of a free press, stating "I cannot think it an unwarrantable presumption to offer my private opinion, and call upon others for their's, and if I use my pen with the boldness of a freeman, it is because I know that the liberty of the press yet remains unviolated . . ."). To subject a republisher of allegedly defamatory material to liability where he received the material from a reputable and reliable source, where he cited to the source, and where he had no reason to disbelieve the veracity of the source, would lead to precisely the type of "intolerable self-censorship" that is repugnant to the First Amendment. Gertz, 418 U.S. at 340.
Such a philosophy is clearly in line with the Rhode Island caselaw discussed infra, the Second Restatement of Torts citedinfra, and the general understanding that a free and vibrant press is integral to our form of government. The facts of the instant case seem to have been foreseen by Justice Owen Roberts, who penned "the price of freedom of religion or of speech or of the press is that we must put up with, and even pay for, a good deal of rubbish." United States v. Ballard et al,322 U.S. 78, 95 (1944) (Roberts, J. dissenting). While it may be no small comfort to similarly situated plaintiffs, the words of Thomas Paine ring no less true today than they did contemporaneously to the founding of our nation — "[t]hose who expect to reap the blessings of freedom must . . . undergo the fatigues of supporting it." Thomas Paine, The AmericanCrisis 63 (R. Carille, ed., 1819).
 IV CONCLUSION
Based upon the foregoing, Defendants' Motions to Dismiss are GRANTED.
Counsel for the prevailing parties shall submit a Judgment and Order consistent with this Decision.
[1] Here incorporation of the Article in its entirety is not necessary. However, because in their memoranda both parties have cited to portions of the Article that were not quoted in the Complaint, this Court may at times similarly refer to portions of the Article not cited in the Complaint, or the Article in its entirety, attached hereto as Appendix 1.
[2] Additionally, the main thrust of the article and of Plaintiffs' defamation claim — that Burke had some role in the media restriction — may not be entirely untrue. While Burke did not unilaterally `impose' the media restriction, the opening of the Article jointly attributes the rule to Burke and Speaker Murphy. As the owner of the venue, Burke certainly had some role, however small, in the media restriction. At this point, however, this Court takes no position as to whether the Article's statements were "exaggerated or slightly off the mark factually" but "substantially true and thus not defamatory." Swerdlick v. Koch,721 A.2d 849, 860 (R.I. 1998). This Court merely takes the statement in the Article as untrue for purposes of this Motion to Dismiss because Plaintiffs allege it to be untrue.
[3] See e.g. Taub v. McClatchy Newspapers, Inc.,504 F. Supp. 2d 74 (D.S.C. 2007); Dupuis v. City ofHamtramck, 502 F. Supp. 2d 654 (E.D. Mich. 2007); Reilly v.Associated Press, 797 N.E.2d 1204 (Mass. App. Ct. 2003);Winn v. Associated Press, 903 F. Supp. 575 (S.D.N.Y. 1995);O'Brien v. Williamson Daily News,735 F. Supp. 218 (E.D.Ky. 1990); Cole v. Star Tribune,581 N.W.2d 364 (Minn.App. 1998); Nelson v. Associated Press,667 F. Supp. 1468, 1476-77 (S.D.Fla. 1987); Auvil v. CBS"60 Minutes", 800 F. Supp. 928, 931 (E.D.Wash. 1992); Matterof Med. Lab. Mgmt. Consultants, 931 F. Supp. 1487 (D.Ariz. 1996);McKinney v. Avery Journal, Inc.,393 S.E.2d 295 (N.C. App. 1990). *Page 1