James D. MARCIL

v.

Robert T. KELLS et al.

No. 2006–196–Appeal.

Supreme Court of Rhode Island.

Dec. 10, 2007.

T. Richard Ratcliffe, Esq., Providence, for James D. Marcil.

Dennis S. Baluch, Esq., Providence, for R. Kells.

John P. Walsh, Esq., for T. Slater.

Present: WILLIAMS, C.J., FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Political campaigning, especially on the party primary election level, is not a game for the faint of heart. This dispute arises from such a contest in a state senatorial district in the City of Providence. The upshot of this primary campaign battle was a judgment for civil conspiracy and slander entered against two of the combatants, who timely appealed to this Court. For the reasons set forth in this opinion, we vacate the judgment of the Superior Court.

### Facts and Procedural History

In August 2000, plaintiff James D. Marcil, a serviceman at the Providence Gas Company (Providence Gas),[1] approached John F. Morris at Morris' store, Charron Supply, to discuss a campaign sign that was prominently displayed on the premises. The sign promoted the candidacies of defendants Robert T. Kells and Thomas C. Slater, who both were on the ballot in the

---

1. This company also is referred to as "New England Gas" in the record.

Democratic primaries for the state Senate and House of Representatives, respectively.[2]

Although it is undisputed that there was a pointed conversation between Marcil and Morris about the sign, exactly what was said between the two remains unclear. In a statement to the state police, Marcil said: "I told [Charron Supply] that I was not comfortable doing business with them with that sign hanging there because it makes the business appear that they are taking a political position." At trial, Marcil testified that he told Morris he should take down the sign because Morris probably would lose business by supporting any candidate in a contested race. Morris testified that his decision to take down the sign was a business decision made in direct response to his conversation with Marcil. In a letter memorializing his conversation with Marcil, Morris wrote:

"Mr. Marcil stated his opposition to one of the candidates listed on the sign, Mr. Kells and asked that we not support him for reasons he gave. He also stated that he worked at the gas company and that he lived in the neighborhood. In his conversation he said that he spoke to many neighbors and gas company employees that share his view and that if I Charron Supply supported the candidate that the community would not support Charron Supply. Mr. Marcil never threatened any influence over gas company business."

No matter what exactly was said, Morris took down defendants' sign from his property after his conversation with Marcil. When he learned of the sign's removal, Kells went to Morris' store. Morris testified that he told Kells that someone in the neighborhood, who worked at the gas company, had objected to the sign. Morris, however, denied telling Kells that Marcil had threatened exercising any influence over gas company business if the sign was not removed. Kells testified that Morris told him he took down the sign to avoid community problems because Marcil had told Morris that the community objected to the sign.

Kells then related his conversation with Morris to Slater at their joint campaign headquarters. Kells testified that he told Slater that Marcil, wearing his gas company uniform, had insinuated to Morris that Providence Gas would not do business with Charron Supply if the sign was not removed. This account varies somewhat from Slater's recollection; Slater testified that Kells said Marcil told Morris that he had many friends in the community who would look unfavorably on the store if the sign was not removed. At trial, Slater denied that Kells mentioned anything about the gas company's not doing business with Charron Supply.

After speaking with Slater, an upset Kells went to Marcil's home to learn more about the circumstances surrounding the sign's removal. Marcil testified that Kells accused him of removing the sign and said, "I'll get you, win or lose this election, I'm going to get you." Marcil also testified that Kells then got in his car, drove about four or five feet, stopped, got out, and yelled, "Do you know who Bob Owens is?" Bob Owens was the gas company vice president whose name appeared on Marcil's paychecks.

This encounter did not end the matter. Slater then called his longtime friend, Helen Toohey, a community relations representative at Providence Gas. Again, and

2. At the time, Kells was an incumbent state senator who was involved in a hotly contested primary race. Slater, an incumbent member of the state House of Representatives, supported Kells, although he himself had no primary opponent.

not surprisingly in this "he said, she said" dispute, testimony regarding Slater's exact words to Toohey is disputed. Toohey's testimony about this conversation was the following:

"I guess there was some political signs on that plumbing supply company building or somewhere on the exterior of the building and that Mr. Marcil found those political signs to be offensive and in fact likely, if [Morris] didn't remove those signs that New England Gas would not do business with him."

In contrast, Slater denied ever mentioning gas company employees in this conversation. In any event, Toohey said she accepted Slater's comments as a complaint, treated them like any other complaint, and referred the matter to her supervisor, James Grasso.

The plot thickened considerably on September 7, 2000, when Marcil's supervisors, Frank Devlin and Bud Butler, called him in for a meeting, at which Joseph Montanaro, his union representative, also was present. Montanaro testified that the supervisors said that if Marcil was holding himself out as a representative of the gas company when he confronted Morris about the sign, his actions could amount to extortion, for which he could be subject to discipline, including termination. Marcil testified that the references to possible allegations of extortion caused him significant anxiety.

As a result of this meeting, Marcil went back to see Morris, who subsequently wrote the above-quoted letter that described his initial conversation with Marcil. Although Marcil testified that he was over-

joyed because he believed the letter exonerated him, he said that he continued to experience retaliation because of the incident. Specifically, as proof of such retaliation, Marcil cited statements that Kells made to him at the polling place on election night, as well as various customer complaints that were placed in his personnel file. Marcil testified that in his eighteen-year career with Providence Gas, he had never received a single customer complaint until this incident.

The plaintiff filed this action in August 2001, alleging that defendants Slater and Kells conspired to slander his reputation and cause him injury by defaming him to his employer and interfering with his contractual relations.[3] At the conclusion of defendants' case, they filed a motion pursuant to Rule 50 of the Superior Court Rules of Civil Procedure, arguing (1) that no evidence had been produced to support a claim of slander *per se* and (2) that any statements made by either defendant were not defamatory because they substantially were true. The trial justice denied defendants' motion because he found that reasonable minds could differ as to both issues.[4]

The jury found that Kells and Slater had engaged in a civil conspiracy to slander Marcil, and it returned a verdict of $50,000 in his favor. Thereafter, defendants presented motions for a new trial, judgment as a matter of law, and remittitur. On March 3, 2006, the trial court denied defendants' motion for judgment as a matter of law, but granted the motion for a new trial, unless plaintiff accepted a remittitur, reducing the amount of the judgment to

**3.** It is not clear from the record how the interference with contractual-relations allegation was resolved; however, it has not been preserved for appeal.

**4.** The trial justice then allowed Marcil to testify about the anxiety he experienced as a result of the incident, though he first had forbidden such testimony. At the conclusion of plaintiff's testimony, defendants renewed their motion, and the trial justice reserved his ruling.

$20,000, within ten days of the hearing. On March 9, 2006, Marcil accepted the remittitur.

However, on March 20, 2006, Kells and Slater filed a timely notice of appeal. Marcil, in turn, filed a cross-appeal. On appeal, defendants argue that the trial court should have: (1) deemed their statements substantially were true; (2) found that the statements were not defamatory; (3) reduced damages to an unspecified nominal amount; (4) not admitted the hearsay testimony of various gas company employees; (5) found plaintiff to be a public figure; (6) dismissed plaintiff's conspiracy claim as prohibited as a matter of law; and (7) found that Kells had a qualified privilege to speak out about Marcil's actions. On his cross-appeal, Marcil contends that the trial court improperly granted the motion for a new trial unless plaintiff agreed to a remittitur and further erred when it failed to instruct the jury on punitive damages.

We hold that the trial justice erred when he denied defendants' motion for judgment as a matter of law. In our opinion, the statements at issue were not defamatory because the words uttered by Slater neither harmed plaintiff's business reputation nor alleged he committed a crime. Therefore, we vacate the judgment entered on behalf of plaintiff. Because we do not believe the statements were defamatory, we need not address the other issues raised on appeal, all of which necessarily hinge on a finding of defamation.

### Standard of Review

When this Court reviews the denial of judgment as a matter of law based on Rule 50(a)(1), it applies the same standards as did the trial justice. *Mills v. State Sales, Inc.*, 824 A.2d 461, 472 (R.I. 2003). The trial justice, and consequently this Court, "considers the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draws from the record all reasonable inferences that support the position of the nonmoving party." *DeChristofaro v. Machala*, 685 A.2d 258, 262 (R.I.1996).

The trial justice may grant a Rule 50(a)(1) motion if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue * * *." *Id.* However, the trial justice must deny the motion if there are factual issues on which reasonable people may draw different conclusions. *DeChristofaro*, 685 A.2d at 262.

### Analysis

To prevail in a defamation action, a plaintiff must prove: " ' (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher'; and (d) damages, unless the statement is actionable irrespective of special harm." *Lyons v. Rhode Island Public Employees Council 94*, 516 A.2d 1339, 1342 (R.I.1986) (quoting Restatement (Second) *Torts* § 558 (1977)). To be actionable as slander *per se*—without proof of special damages—the false statement must impute to the other: (1) a "criminal offense," (2) a "loathsome disease," (3) a "matter incompatible with his business, trade, profession, or office," or (4) a "serious sexual misconduct." Restatement (Second) *Torts* § 570 at 186 (1977).

With respect to the first element of defamation, a plaintiff must show that the statement is "false and malicious, imputing conduct which injuriously affects a mans reputation, or which tends to degrade him in society or bring him into public hatred and contempt * * *." *Reid v. Providence Journal Co.*, 20 R.I. 120,

124–25, 37 A. 637, 638 (1897). Whether the meaning of a particular communication is defamatory is a question of law for the court to decide rather than a factual issue for a jury to determine. *Alves v. Hometown Newspapers, Inc.*, 857 A.2d 743, 750 (R.I.2004); *Elias v. Youngken*, 493 A.2d 158, 161 (R.I.1985). "[T]he decisive question is what the person or persons to whom the communication was published reasonably understood as the meaning intended to be expressed." Restatement (Second) *Torts* § 563 cmt. *e.* at 164 (1977). A plaintiff must show that the publication was defamatory on its face or by way of innuendo. *See Andoscia v. Coady*, 99 R.I. 731, 735, 210 A.2d 581, 584 (1965).

We do not agree with the trial justice that the statements at issue here were defamatory *per se*. Rather, we hold that they were not because they neither harmed plaintiffs business reputation nor alleged that he committed a crime, either on their face or by any reasonable connotation. Thus, in our opinion, the trial justice erred when he denied defendants motion for judgment as a matter of law.

■ Slater's statements to Toohey about Marcil were not facially defamatory because the plain meaning of his words did not harm plaintiff's business reputation nor allege that he committed a crime. When evaluating a potentially defamatory statement, we have held that words alleged to be defamatory must be read in the context of the publication in which they appear. *See Bray v. Providence Journal Co.*, 101 R.I. 111, 116, 220 A.2d 531, 534 (1966). The suspect verbiage is to be construed in its "plain and ordinary sense" and "presumed to have [been used] in [its] ordinary import in the community in which

[it is] uttered or published." *Reid*, 20 R.I. at 122, 37 A. at 637.

It is well settled that a statement is defamatory *per se* if it charges improper conduct, lack of skill, or integrity in ones profession or business, and is of such a nature that it is calculated to cause injury to one in his profession or business. Restatement (Second) *Torts* § 573 (1977). But, the disparaging words must affect the plaintiff in some way that is peculiarly harmful to one engaged in his trade or profession; disparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality is peculiarly valuable to the plaintiffs business or profession. *Id.* Thus, an imputation of moral misconduct is not actionable *per se* to a tradesman, though it might be if spoken about a clergyman. *Id.* § 573 cmt. *c.; see Swerdlick v. Koch*, 721 A.2d 849, 861 (R.I.1998) (holding that allegations of the plaintiff's nonpayment of taxes were not defamatory *per se* because such statements did not, in any way, affect or relate to his business).

Here, Slater and Toohey disagree about the exact words Slater uttered to Toohey about Marcil. However, we believe that even Toohey's testimony,[5] which is the version more injurious to plaintiff, did not in any way harm plaintiff's business reputation.[6] We wholly disagree with plaintiff's argument that Slater's statements accused him of dishonesty. Dishonesty is defined as a "lack of honesty; a disposition to lie, cheat, or steal." Random House Unabridged Dictionary 565 (2nd ed.1993). Slater's words did not address any of these characteristics. Thus, we hold that Slater's statements did not, on their face, harm Marcil's business reputation.

---

**5.** Toohey testified that Slater told her that Marcil said to Morris that it was "in fact likely, if [Morris] didn't remove those signs that New England Gas would not do business with him."

**6.** It should be noted that the trial justice found Toohey to be an especially credible witness.

■ The statements at issue, on their face, also did not accuse plaintiff of committing any crime. We have held that the essential elements of a crime must be alleged by a defendant for his statements to be considered defamatory *per se*. *See, e.g., Canning v. Owen,* 24 R.I. 233, 238, 52 A. 1027, 1029 (1902) (holding that the defendants statements were not defamatory *per se* when he failed to allege that the plaintiff burned down another persons house because burning down ones own house is not considered arson); *Fanning v. Chace,* 17 R.I. 388, 389, 22 A. 275, 275 (1891) (holding that the defendants statements were not defamatory *per se* because the defendant accused the plaintiff of having an intent to commit a crime but not actually committing or attempting to commit such a crime). However, for his statements to be defamatory *per se*, a defendant need not state the actual crime committed, if the elements are alleged. *See Ogrodnick v. Providence Journal Co.,* 93 R.I. 316, 317, 175 A.2d 289, 291 (1961).

Here, Marcil alleged that Slater accused him of committing extortion. In Rhode Island, extortion is defined as the following:

> "Whoever, verbally or by a written or printed communication, maliciously threatens to accuse another of a crime or offense or by a verbal or written communication maliciously threatens any injury to the person, reputation, property, or financial condition of another, or threatens to engage in other criminal conduct with intent to extort money or any unlawful pecuniary advantage, or with intent to compel any person to do any act against his or her will, or to prohibit any person from carrying out a

duty imposed by law, shall be punished by imprisonment in the adult correctional institutions for not more than fifteen (15) years or by a fine of not more than twenty-five thousand dollars ($25,000), or both." G.L.1956 § 11–42–2.

We have held that extortion consists of two basic elements: "(1) an oral or a written threat to harm a person or property, (2) accompanied by the intent to compel someone to do something against his or her will." *State v. Price,* 706 A.2d 929, 933 (R.I.1998). The specified threat must be made with the intent to extort in order to find an individual has committed extortion. *State v. Mancini,* 108 R.I. 261, 275, 274 A.2d 742, 749 (1971).

Slater's statements about Marcil, even accepting Toohey's version, did not on their face, charge plaintiff with extortion. None of Slaters words alleged that Marcil maliciously threatened Morris with the intent to compel him to act unwillingly. Rather, we believe his statements, at most, amounted to a suggestion of a potential economic boycott of Morris business. Tooheys reaction to Slaters statements supports this conclusion because she treated the statements as a standard complaint, not a criminal charge. Although Marcils supervisors later used the word "extortion" when characterizing the statements made against Marcil, Toohey unequivocally testified that Slater never used that word in his conversation with her. Slater is not accountable for the aggrandizement of his words, which arose only after Toohey passed Slaters message to a variety of gas company officials.[7] Thus, we hold that Slaters statements did not, on their face, allege that Marcil committed a crime.

It is also our opinion that no reasonable connotation of Slaters statements about

---

7. The facts here are reminiscent of the classic childhood game of "Telephone," also referred to as Operator, in which successive participants secretly repeat to the next person a phrase or sentence that the preceding participant whispered to them. Richard Dawkins, *Foreword* to Susan J. Blackmore, *The Meme Machine,* at × (Oxford University Press

Marcil can be said to be defamatory because there were no extrinsic factors known by Toohey that would have led her to believe that the statements harmed Marcils business reputation or charged him with the commission of a crime.[8] Although innuendo is more typical in libel cases, proof of any statement reasonably connoting defamation is allowed in slander cases as well. *See* 2 *Sack on Defamation* § 2.4.5 at 2–32 (2006) ("A publisher is, in general, liable for the implications of what he or she has said or written, not merely the specific, literal statements made.").

We have said that innuendo may be used to define the defamatory meaning of words that may be equivocal, but it cannot be used to introduce new matter or to enlarge the meaning of words or give to language a construction it will not bear. *See Bray,* 101 R.I. at 115, 220 A.2d at 534 (holding that the word "testimony" could not be enlarged to mean testimony "under oath" because there was no extrinsic evidence to demonstrate that the testimony at issue was known to be taken under oath); *see also Della Posta v. Rand Express Freight Lines, Inc.,* 86 R.I. 148, 133 A.2d 775 (1957).

In *Della Posta,* 86 R.I. at 151–52, 133 A.2d at 777, the defendant employer received a letter from a customer accusing the plaintiff employee of larceny. Referring specifically to the allegations in the letter, the defendant fired the plaintiff and said, "[w]e don't want men of your calibre around here," in front of the plaintiffs fellow employee, who also was aware of the letters content. *Id.* at 154, 133 A.2d at 778. Although the phrase "men of your

calibre" was not defamatory on its face, the Court allowed the jury to consider whether it was defamatory considering extrinsic factors, namely the contents of the letter known to the publishee. *Id.* at 155, 133 A.2d at 779.

Here, Marcil offers no extrinsic factors known to Toohey that would support the proposition that Slaters statement connoted defamation or that Toohey interpreted Slaters words to be defamatory. Unlike the words used in *Della Posta,* none of the words defendant Slater used even is susceptible to a secondary defamatory meaning. Additionally, the extrinsic factors that Marcil stresses, including that defendant Kells intimidated him at his home and at the polls on the night of the election, do not add any meaning to the words spoken by Slater. Finally, in contrast to the letter in *Della Posta,* of which the third party publishee was aware, there were no extrinsic factors here that were known to Toohey. The meaning of Slaters words cannot be enlarged to show that the statements either harmed Marcils business reputation or alleged that he committed a crime. Thus, the defendants motion for judgment as a matter of law based on Rule 50 should have been granted.

### Conclusion

For the reasons stated herein, we vacate the judgment of the Superior Court. The record shall be remanded to the Superior Court.

Justice GOLDBERG did not participate.

---

2000). As in this game, the person generating the initial message cannot be held accountable for the final statements that are often greatly exaggerated.

**8.** Because we are vacating the judgment below, on the grounds that the trial justice erred in denying defendants' Super.R.Civ.P. 50 motion, it is immaterial that defendants did not object to the jury instructions concerning the allegation of defamation by inference.