Robert I. BURKE et al.

v.

Katherine GREGG et al.

No. 2011–148–Appeal.

Supreme Court of Rhode Island.

July 5, 2012.

John R. Mahoney, Esq., Providence, for Plaintiff.

Joseph V. Cavanagh, Jr., Esq., Providence, for Defendant Katherine Gregg & the Providence Journal Company.

Jeffrey S. Brenner, Esq., Providence, for Defendant Dan York & Citadel Broadcasting Company.

Present: GOLDBERG, FLAHERTY, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Any listener who tunes in to local radio on a regular basis is familiar with Rhode Island's cadre of colorful talk radio personalities. Every day, the hosts of these programs seek to create debate and com-

mentary about local news, with a palpable emphasis on the latest real or imagined political intrigue. The stimulus for the conversation often is an article or story reported by an organ of the news media. On occasion, tensions flare and these conversations deteriorate from moderate exchanges into heated free-for-all arguments: the tone can become caustic, the comments blunt, unrefined, and downright unfair. The airwaves carry these comments not only into automobiles and homes, but rarely into courtrooms. We are reminded of the sage advice of the taciturn thirtieth president of the United States, Calvin Coolidge: "I have noticed that nothing I never said ever did me any harm."

This controversy emanates from a newspaper article written by defendant Katherine Gregg that sparked an acrimonious and childish on-air rant by defendant Dan Yorke, a well-known radio talk show host, about plaintiff Robert I. Burke, a local restaurateur often involved in community endeavors. The article described an annual St. Patrick's Day lunch hosted by William Murphy, the then-Speaker of the House of Representatives of the Rhode Island General Assembly, at one of Burke's restaurants. The lunch, a private event, was in large measure a "roast" of local public figures. In a story published by the Providence Journal, Gregg was openly critical of an "off the record" rule that allowed members of the media to attend the event, but banned them from disclosing the jokes made during the lunch. Her article attributed the creation and enforcement of the policy to both Burke and Murphy. Apparently incensed by the article, Yorke used his talk show as a platform to hurl a series of crude and disparaging remarks at Burke from the safety of his microphone.

Eventually, Burke filed a complaint in the Providence County Superior Court, alleging various counts of libel and slander against Gregg, the Providence Journal Company, Yorke, and Citadel Broadcasting Corporation.[1] Two other plaintiffs also joined in the action: BOEA, Inc. and the Food & Beverage Corporation. Food & Beverage Corp., which operates Burke's restaurant, Pot au Feu, and is a parent corporation of BOEA, alleged its own counts of libel, slander, and interference with contractual relations against Yorke and Citadel. BOEA, the entity that operates Federal Reserve Special Events, alleged libel, slander, and breach of contract against Yorke and Citadel. All defendants filed motions to dismiss pursuant to Rule 12(b)(6) of the Superior Court Rules of Civil Procedure, and those motions were granted by a justice of the Superior Court. The plaintiffs timely appealed to this Court.

On May 2, 2012, the parties appeared before this Court for oral argument based on an order directing the parties to show cause why the issues raised by defendants' appeal should not be decided summarily without further briefing or argument. After considering the record, the memoranda submitted by the parties, and the arguments advanced by each, we are of the opinion that cause has not been shown and that the appeal should be decided at this time. For the reasons set forth in this opinion, we affirm in part and vacate in part the judgment of the Superior Court, and we remand the matter for a hearing on plaintiffs' breach of contract claim.

---

1. At the relevant time, Citadel Broadcasting owned and operated WPRO, the station which broadcasts Yorke's program.

## I

## Facts & Travel

The plaintiff Robert Burke is the Vice President of Food and Beverage Corp. and BOEA, Inc.[2] These two entities operate Pot au Feu Restaurant and Federal Reserve Special Events, respectively, in downtown Providence.[3] From 2006 until 2008, then-Speaker William Murphy invited prominent Rhode Island politicians, businesspeople, and members of the media to a St. Patrick's Day event at the Federal Reserve Restaurant euphemized as the "Murphy's Law Luncheon." During the lunch, some of the guests—mostly fellow politicians—would "roast" other attendees by making jokes and playfully lampooning one another. The event was also a fundraiser for a charitable cause.

In March 2009, Murphy planned to have his lunch as usual, but this time he informed members of the press before the event that, unlike previous years, any of the jokes, gags, or punch lines would be "off the record." In other words, reporters who decided to attend would be prohibited from publishing what was said during the roast.[4] According to plaintiffs, on the day before the event, Gregg called Burke to register her protest about the "off the record" rule, and Burke told her that it was Murphy—not he—who was responsible for the new restriction. A spokesperson representing Murphy apparently e-mailed Gregg later that day about the

policy. Gregg replied to the spokesperson's message, asking Murphy to reconsider and to allow the media to publish the comments made at the lunch. Burke says that Gregg sent him another e-mail on March 20 that again incorrectly imputed the "off the record" rule to him. In response, he wrote back saying that he was unclear why she continued to attribute the press policy for the Murphy's Law event to him, and that he considered her persistent accusations of censorship to be "repugnant and false."

Three days later, the Providence Journal published an article, co-authored by Gregg, entitled "Rhode Island's Grand Old Party putting on a brave front." A portion of the article, sub-titled "The hush of the Irish," described the Murphy's Law lunch and compared it to a similar event held annually in South Boston. The article emphasized that the Providence lunch employed a "press ban" although the Boston event did not. The relevant portion of the article said:

> "In Rhode Island, House Speaker William J. Murphy and his host, restaurateur and frequent State House vendor Robert Burke, banned reporters from disclosing what Murphy had to say at what was billed as the fourth-annual Murphy's Law Luncheon.
>
> " * * *
>
> "[']One of the hoped-for side effects of the event is to lessen the polarization

---

2. Because under the applicable standard of review we must presume all the allegations in the complaint are true, see *infra* at part III, we shall relate the facts as alleged in plaintiffs' complaint.

3. Federal Reserve Special Events does business as the Federal Reserve Restaurant.

4. There is no authoritative definition for the phrase "off the record." However, we believe that New York University's Journalism Handbook provides a definition that encapsu-

lates the most common understanding of the term: it is a prearranged agreement between a reporter and a source that "restricts the reporter from using the information the source is about to deliver." Adam L. Penenberg, *NYU Journalism Handbook for Students: Ethics, Law and Good Practice* 4–5, *available at* http://journalism.nyu.edu/assets/Page SpecificFiles/Ethics/NYU–Journalism–Handbook–for–Students.pdf (last visited June 21, 2012).

that has become rife in our politics[,'] Burke said in a recent exchange of e-mails. He said he imposed the off-the-record rule because he felt a former Journal columnist took a Murphy quip about homosexuals, at an earlier St. Patrick's Day lunch, out of context ... creating an impression of an event that is mean-spirited.

"[']The phrase [o]nce burned, twice shy applies,['] he said."

The Providence Journal published the article in both its print edition and on its website.

The co-defendant, Dan Yorke, was the host of a talkback, news format radio program that aired on WPRO (630 AM) and WEAN (99.7 FM), and an employee of co-defendant Citadel Broadcasting Company. In the complaint, plaintiffs alleged that on the day that the Journal published Gregg's story, Yorke read the article and then launched into a crude and boorish tirade—or what Yorke characterized as "a little bit of a bender"—that railed against Burke and the "off the record" rule. Among other things, Yorke said:

"That Bob Burke thinks he can control the First Amendment.

"You can kiss my Irish ass. You manipulative piece of garbage.

" * * * I wouldn't buy a napkin from that guy for the rest of my life. I actually like his two restaurants. I can promise you. You will never see me at any one of his two places because he stinks of the full Rhode Island.

" * * *

"You piece of garbage. Rhode Island needs an enema and it ought to start with Bob Burke.

" * * *

" * * * What an absolute disgrace that guy is.

" * * *

"And stupid Bob Burke. He's too stupid. He's a stupid person. He's too stupid to understand that I don't have, have a problem with the event. I have a problem with the gag order.

" * * *

"You punk, mob type actor. You B mob actor Bob Burke. You're going to threaten me with coppin' Buddy Cianci's name. Like I'm going to wobble and fall over, over that? You punk!"

Burke apparently had been unaware of either the article or the broadcast until two people telephoned him and informed him what Yorke was saying on his show. Burke called in to the program to find out why Yorke was criticizing him and to respond to those comments.[5] According to plaintiffs, Yorke's statements were broadcast on radio, streamed across the internet, and posted on a website maintained by Citadel Broadcasting.

In addition, plaintiffs alleged in their complaint that from time to time both Food and Beverage Corp. and BOEA had a contract with Citadel Broadcasting to advertise those businesses on two of its stations, WPRO–FM and WWKX–FM. These agreements called for the stations to air radio ads for Pot au Feu and Federal Reserve Special Events. The plaintiffs alleged that as recently as January 2009 they had entered into advertising contracts with Citadel Broadcasting, and that a contractual relationship existed at the time of Yorke's broadcast on March 23, 2009.

## II

### Standard of Review

In reviewing a justice's decision on a Rule 12(b)(6) motion to dismiss, we

---

**5.** Although the parties have indicated that Burke and Yorke had an on-air exchange, the exact contents of that exchange are not detailed in the record.

apply the same standards as the motion justice. *See Tucker Estates Charlestown, LLC v. Town of Charlestown,* 964 A.2d 1138, 1140 (R.I.2009). "[T]his Court examines the allegations contained in the plaintiff's complaint, assumes them to be true, and views them in the light most favorable to the plaintiff." *Palazzo v. Alves,* 944 A.2d 144, 149 (R.I.2008) (citing *Ellis v. Rhode Island Public Transit Authority,* 586 A.2d 1055, 1057 (R.I.1991)). " '[T]he sole function of a motion to dismiss is to test the sufficiency of the complaint,' and thus this Court need not look further than the complaint in conducting our review." *Id.* (quoting *Rhode Island Affiliate, ACLU, Inc. v. Bernasconi,* 557 A.2d 1232, 1232 (R.I.1989)). This Court will affirm a motion justice's ruling that grants a motion to dismiss pursuant to Rule 12(b)(6) "when it is clear beyond a reasonable doubt that the plaintiff would not be entitled to relief from the defendant under any set of facts that could be proven in support of the plaintiff's claim." *Id.* at 149–50 (quoting *Ellis,* 586 A.2d at 1057).

## III

### Analysis

#### A. Plaintiffs' Defamation Claims Against Gregg and the Providence Journal

Because our analysis of plaintiffs' allegations against Yorke and Citadel rests, at least in part, on our conclusion with respect to the claims against Gregg and the Providence Journal, we shall address the latter first. The plaintiffs' claims against Gregg and the Providence Journal sound in defamation. "To prevail in a defamation action, a plaintiff must prove: '(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the

part of the publisher; and (d) damages, unless the statement is actionable irrespective of special harm.' " *Marcil v. Kells,* 936 A.2d 208, 212 (R.I.2007) (quoting *Lyons v. Rhode Island Public Employees Council 94,* 516 A.2d 1339, 1342 (R.I. 1986)). "With respect to the first element of defamation, a plaintiff must show that the statement is 'false and malicious, imputing conduct which injuriously affects a man[']s reputation, or which tends to degrade him in society or bring him into public hatred and contempt * * *.' " *Id.* (quoting *Reid v. Providence Journal Co.,* 20 R.I. 120, 124–25, 37 A. 637, 638 (1897)). "[T]he decisive question is what the person or persons to whom the communication was published reasonably understood as the meaning intended to be expressed." *Id.* at 213 (quoting Restatement (Second) Torts § 563 cmt. *e.* at 164 (1977)).

It is well settled that whether a particular communication is defamatory or not is a question of law for the court to decide, and not an issue of fact for a jury. *See Marcil,* 936 A.2d at 213; *Alves v. Hometown Newspapers, Inc.,* 857 A.2d 743, 750 (R.I.2004); *Elias v. Youngken,* 493 A.2d 158, 161 (R.I.1985). Furthermore, we have held that in making this determination, the court must consider the allegedly defamatory words "in the context of the publication in which they appear," rather than read them in isolation. *Marcil,* 936 A.2d at 213. "The suspect verbiage is to be construed in its 'plain and ordinary sense' and 'presumed to have [been used] in [its] ordinary import in the community in which [it is] uttered or published.' " *Id.* (quoting *Reid,* 20 R.I. at 122, 37 A. at 637).

After considering the content and context of Gregg's article and the manner in which the Providence Journal published it, we agree with the motion justice that her attribution of the "off the record" rule

to Burke, even if false or inaccurate, was not defamatory. In our opinion, when considered in its totality from the point of view of an ordinary reader, Gregg's article can reasonably be understood to communicate that Burke, in cooperation with Murphy, imposed an "off the record" rule because he was concerned that if the brash, politically-incorrect humor employed during the lunch was read out of context, it might create "an impression of an event that is mean-spirited." That sentiment would be at odds with the purpose of the event, which in Burke's own words, was intended "to lessen the polarization that has become rife in our politics." We agree with the motion justice that even though the article has an inescapably critical tone, it also suggests that Burke and Murphy had a prudent, thoughtful, and logical reason for imposing an "off the record" rule. The plaintiffs have not argued that Gregg's explanation of the rule's underlying rationale is in any way inaccurate. Even if her statements were "slightly off the mark factually," *Swerdlick v. Koch*, 721 A.2d 849, 860 (R.I.1998), we cannot conceive of how these comments could reasonably be interpreted to have injuriously affected Burke's reputation, degraded him in society, or brought him into public hatred and contempt.

■ Despite the arguments of plaintiffs, we are not persuaded that our holding in *Della Posta v. Rand Express Freight Lines, Inc.*, 86 R.I. 148, 133 A.2d 775 (1957), applies to the circumstances of this case. In *Della Posta*, the defendant fired the plaintiff and said, "[w]e don't want men of your calibre [*sic*] around here." *Id.* at 154, 133 A.2d at 778. That statement was made in front of plaintiff's coworker, who was aware of a letter to the employer from a customer that accused the plaintiff of larceny. *Id.* at 154, 133 A.2d at 778. This Court held that the phrase "men of your

calibre [sic]" was not defamatory on its face, but its meaning was ambiguous. *See id.* at 154–55, 133 A.2d at 778. When confronted with an ambiguous statement, the language should be submitted to the jury to be considered in connection with other circumstances in order to determine whether it was in fact defamatory. *See id.* at 155, 133 A.2d at 778–79. Here, the plaintiffs have pointed to neither ambiguous language in Gregg's article nor a similar specific context that would clarify such language. They rely instead on the vague assertion that the political climate was "very divisive and hostile." Communication, by its very nature, does not occur in a vacuum; there is always some context. If followed to its logical end, plaintiffs' argument would require all allegedly defamatory statements to be submitted to a jury. This is incompatible with, and indeed flies in the face of our established law, which under most circumstances reserves that determination to the court. We are unwilling to depart from that precedent. *See Marcil*, 936 A.2d at 213.

In our view, plaintiffs' contention that the gist of the article was that "Mr. Burke is someone to be disliked because he is a political insider who attacks the First Amendment" is overly broad and does not accurately reflect either the language or the context of the contested statement. The offending statement—that Burke created and enforced the "off the record" rule—is unambiguous. The plaintiffs have not provided, and we have not found, any legal support for their suggestion that a single individual's opinion drawn from a contested statement is proof that the statement itself was in fact defamatory.

■ We recognize that "[a] plaintiff in a defamation action carries a substantial burden." *Alves*, 857 A.2d at 750. The accuracy of this statement is supported by even a brief survey of reported cases: the

cases holding that a particular comment is defamatory are few and far between, contrasting with the countless actions in which courts have concluded that far more egregious statements than the one before us here do not rise to a level that would create liability. *See, e.g., Fram v. Yellow Cab Co.,* 380 F.Supp. 1314, 1329 (W.D.Pa. 1974) (holding that use of the words "paranoid" and "schizophrenic" held to be nondefamatory absent evidence of reference to actual psychological condition); *Blomberg v. Cox Enterprises, Inc.,* 228 Ga.App. 178, 491 S.E.2d 430, 433 (1997) (holding that statement referring to the plaintiff as "a silver-tongued devil" not defamatory); *Pace v. Rebore,* 107 A.D.2d 30, 485 N.Y.S.2d 291, 293 (1985) (holding that a statement that the plaintiffs used "political clout" to obtain tax exemption was not defamatory). Even when viewed through the prism of the liberal Rule 12(b)(6) standard, we simply are not persuaded that plaintiffs stated a claim upon which they could recover because, in our opinion, Gregg's article, as a matter of law, was not defamatory. Therefore, we affirm the motion justice's dismissal of plaintiffs' claims against Gregg and the Providence Journal.

## B. Plaintiffs' Defamation Claims Against Yorke and Citadel Broadcasting

"[I]t is well settled that 'one who republishes libelous or slanderous material is subject to liability just as if he had published it originally.' " *Trainor v. The Standard Times,* 924 A.2d 766, 770 (R.I. 2007) (quoting *Martin v. Wilson Publishing Co.,* 497 A.2d 322, 327 (R.I.1985)); see also *Metcalf v. Times Publishing Co.,* 20 R.I. 674, 678, 40 A. 864, 865 (1898). "[T]he repeater cannot defend on the ground of

truth simply by proving that the source named did, in fact, utter the statement." *Martin,* 497 A.2d at 327 (quoting *Olinger v. American Savings and Loan Association,* 409 F.2d 142, 144 (D.C.Cir.1969)). "The republication rule applies to the press as it does to others." *Id.*

We also must bear in mind that Yorke's derisive remarks were expressed in the form of an opinion. Even though it is true that a statement of opinion may be defamatory, opinion statements are afforded greater protection under our law. To underscore this point, this Court previously has turned to an "often quoted dictum" from *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), in which the United States Supreme Court stated: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." [6] *Healey v. New England Newspapers, Inc.,* 520 A.2d 147, 150 (R.I.1987) (quoting *Gertz,* 418 U.S. at 339–40, 94 S.Ct. 2997). Thus, this Court has held that "a statement in the form of an opinion * * * is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Id.* at 150 (quoting 3 Restatement (Second) *Torts* § 566 at 170); *see also Belliveau v. Rerick,* 504 A.2d 1360, 1362 (R.I.1986); *Hawkins v. Oden,* 459 A.2d 481, 484 (R.I.1983). In *Healey,* this Court cited with approval the American Law Institute's explanation of the republication rule:

"A simple expression of opinion based on disclosed or assumed nondefamatory

---

6. As noted by the motion justice, this passage appears to reflect the Utilitarian thought of John Stuart Mill. *See* John Stuart Mill *On Liberty* 81 (1859) ("The beliefs which we have most warrant for have no safeguard to rest on but a standing invitation to the whole world to prove them unfounded.").

facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently. The difference lies in the effect upon the recipient of the communication." *Healey*, 520 A.2d at 151 (quoting 3 Restatement (Second) *Torts* § 566, cmt. *c.* at 173).

That kind of statement is not actionable as defamation because "[w]hen the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as *insinuating* the existence of additional, undisclosed [defamatory] facts." *Beattie v. Fleet National Bank*, 746 A.2d 717, 721 (R.I.2000) (quoting *Standing Committee on Discipline v. Yagman*, 55 F.3d 1430, 1439 (9th Cir.1995)). Thus, there are two factors that must guide our analysis: (1) whether the basis for Yorke's opinion was disclosed to his audience; and (2) whether the basis for the speaker's opinion was itself defamatory. After applying that analysis to the facts, which we must assume are true under a Rule 12(b)(6) analysis, we conclude that the motion justice did not err when he dismissed plaintiffs' defamation claims against Yorke and Citadel Broadcasting.

It is beyond question that Burke was justifiably offended by Yorke's March 23 broadcast. Yorke's rambling diatribe would without a doubt ruffle the sensibilities of any listener at whom it was directed. Nevertheless, "it is a prized American privilege to speak one's mind, although not always with perfect good taste * * *."

*Bridges v. California*, 314 U.S. 252, 270, 62 S.Ct. 190, 86 L.Ed. 192 (1941). According to plaintiffs' complaint, Yorke disclosed the fact that his opinions sprang from Gregg's article, which was openly referred to during his broadcast. Therefore, his opinions unquestionably represented his interpretation of the facts presented in her article. Furthermore, as discussed above, even if Gregg's assertion that Burke was responsible for the "off the record" rule was false or inaccurate, we have concluded that as a matter of law it was not defamatory. Therefore, Yorke's comments were based on disclosed, non-defamatory facts, and we affirm the judgment of the Superior Court dismissing those claims. *See Healey*, 520 A.2d at 150–51.

### C. Plaintiffs' Contractual Claims against Yorke and Citadel Broadcasting

The plaintiffs BOEA and Food & Beverage Corp. also lodged two contractual claims against Yorke and Citadel Broadcasting. Count 5 of the complaint alleged breach of contract against Citadel; Count 6 alleged interference with prospective contractual relations against both Citadel and Yorke. The travel of the case with respect to these two counts is somewhat unusual. It appears that both Yorke and Citadel filed motions to dismiss the complaint on May 11, 2010. Citadel's motion was based on Rule 12(b)(1), (2) and (6). Yorke's motion was predicated solely on Rule 12(b)(6). On July 27, 2010, a justice of the Superior Court held a hearing on Yorke's and Citadel's motions.[7] After the hearing, the motion justice rendered a bench decision that ruled on counts 2, 3, 4 and 6. Although he initially deferred ruling on count 6, interference with prospective contractual relations, in order to afford

---

7. At the time of the July 2010 hearing, Gregg and the Providence Journal had not yet filed their motions to dismiss, only further complicating the travel of this case below.

plaintiffs an opportunity to amend the complaint, plaintiffs represented that they would not seek to amend; therefore, he dismissed count 6 as well. To clarify his reasoning on all of the defamation claims, however, the motion justice later issued a written decision. That decision ruled on all the motions to dismiss filed by all four defendants with respect to counts 1, 2, 3 and 4. It did not address either of the contractual claims.

First, based on our review of the record, it appears that when he gave his oral decision, the motion justice did not definitively rule on count 5 of plaintiffs' complaint, the alleged breach of contract by Citadel Broadcasting. Because the motion justice did not address this issue, we remand this matter to the Superior Court for a hearing on defendant's motion to dismiss with respect to that count.

 As for count 6 of plaintiffs' complaint, we hold that the motion justice did not err when he granted defendants' motions to dismiss. To prevail on a claim for interference with prospective contractual relations, a plaintiff must show: "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." *L.A. Ray Realty v. Town Council of Cumberland,* 698 A.2d 202, 207 (R.I.1997) (quoting *Mesolella v. City of Providence,* 508 A.2d 661, 669 (R.I.1986)). Furthermore, "[p]roof of causation in this tort requires proof 'either that but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the relationship would have been established.'" *Id.* (quoting *Mesolella,* 508 A.2d at 671). In their complaint, plaintiffs allege that defendants' defamatory statements interfered with "prospective business clients" by damaging their image in the public eye, which resulted in a loss of business.

We agree with the motion justice that the allegations in the plaintiffs' complaint do not pass muster under our long-standing Rule 12(b)(6) analysis. The complaint fails to allege any causal connection between Yorke's March 23 statements and interference with even one specific, prospective relationship; it is purely speculative. Perhaps more importantly, the plaintiffs failed to allege any *intentional* acts by Yorke or Citadel that were aimed at interfering with a potential client relationship. The plaintiffs have pointed to nothing to suggest that the effect of Yorke's comments—if any—was more than ancillary or incidental. Because the plaintiffs did not allege any intentionally disruptive conduct by Yorke or Citadel, the count was correctly dismissed by the motion justice.

### Conclusion

The judgment of the Superior Court dismissing counts 1, 2, 3, 4, and 6 of the plaintiffs' complaint is affirmed. This matter is remanded to the Superior Court for a hearing on count 5 of the plaintiffs' complaint. The papers from this case are remanded to the Superior Court.

Chief Justice SUTTELL and Justice ROBINSON did not participate.